

ORIGINAL

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

2014 SEP 11 P 3:07

CLERK US DISTRICT COURT
ALEXANDRIA, VIRGINIA

| | |
|---|---|
| Middle East Broadcasting Networks, Inc., ) <br> 7600 Boston Boulevard ) <br> Springfield, Virginia 22153 ) <br> ) <br>     Plaintiff, ) <br> ) <br> v. ) <br> ) <br> MBI Global, LLC, ) <br> SERVE: ) <br> Gary Bowen ) <br> Vice President ) <br> 6128 Kirkland Drive ) <br> Warrenton, Virginia 20187 ) <br> ) <br>     Defendant. ) | Civil Action No. 1:14 CV 1207 GBL/IDD <br><br> **JURY TRIAL DEMANDED** |

## COMPLAINT AND JURY DEMAND

COMES NOW Plaintiff Middle East Broadcasting Networks, Inc. ("MBN"), by and through its undersigned counsel, and brings this suit against Defendant MBI Global, LLC ("MBI") and for its Complaint states as follows:

### Nature of the Case

This is a case about false promises, misleading statements, excuses and serial breaches of a sales agreement and amendments thereto. Eight months after MBI promised delivery of a Blast Resistant Building ("BRB") to be equipped and used as a television studio by MBN's news staff in Baghdad, Iraq – and one year after MBN tendered a substantial deposit thereon – MBI has failed to deliver the BRB and MBN has a displaced staff and ongoing, significant rental expenses for temporary studio space.

1

## Parties, Jurisdiction and Venue

1. Plaintiff MBN is a private, non-profit 501(c)(3) corporation that was incorporated in the District of Columbia and has its principal place of business in Springfield, Virginia.

2. Upon information and belief, Defendant MBI is a limited liability company that was organized under the laws of Louisiana and has its principal place of business in Shreveport, Louisiana.

3. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because the parties are of diverse citizenship and the amount in controversy exceeds $75,000.00.

4. Venue in this Court is appropriate under 28 U.S.C. §1391 because a substantial portion of the events and circumstances giving rise to the claims herein occurred in Virginia, Defendant conducts business in Virginia, and the Parties agreed that venue in this Court would be appropriate in the event of litigation.

## Factual Allegations

5. Plaintiff MBN, founded in 2003, is a multi-platform broadcasting company that provides news and information, in Arabic, to the populations of the Middle East and North Africa on Alhurra TV, Radio Sawa, their websites and social media. MBN receives one hundred percent of its funding through a grant from the United States Government, which is administered by the Broadcasting Board of Governors, an independent federal agency. MBN's mission is to provide objective, accurate, and relevant news and information to the people of the Middle East about the region, the world, and the United States. MBN supports democratic values by expanding the spectrum of ideas, opinions, and perspectives available in the region's media.

6. In addition to its headquarters in Springfield, Virginia (from which all broadcasts originate), MBN has news operations, bureaus and/or branch offices in Dubai, Beirut, Jerusalem,

Cairo, Baghdad and Washington, D.C. The office at issue here is MBN's branch in Baghdad, which has been in operation since 2004, and currently employs 77 news professionals, technicians and administrative staff.

7. Beginning in 2004, MBN rented space for its Baghdad staff and operations at the Palestine Hotel.

8. Beginning in 2012, MBN experienced difficulties with the new corporate owner of the Palestine Hotel. Specifically, the new owner, apparently unhappy with the monthly rent being paid by MBN, began to threaten MBN with the suspension of necessary services (such as electricity) and eviction. The new owner refused to renew MBN's lease, returned rental and other payments made to it by MBN and brought a series of court cases against MBN.

9. In 2013, with eviction looming, MBN rented office space from another vendor in Baghdad. Though the rented office space provided workspace for MBN's news and administrative staff, there was no room for a necessary television studio.

10. MBN realized that the possibilities were two: either to build a permanent structure outside and alongside the rental to house the television studio, or, alternatively, to buy a blast resistant building ("BRB") in which the studio could be assembled. Believing that the latter alternative would be a better solution for the long term, MBN sent out a Request for Quote ("RFQ") to various American manufacturers of suitable blast resistant buildings.

11. By this RFQ, MBN sought a BRB and delivery and installation thereof at its offices in Baghdad no later than December 31, 2013.

12. All of the companies submitting quotes for the BRB, including Defendant MBI, were aware of the timeframe for the completion and delivery thereof; all of them, including MBI,

realized that the timing was being driven by MBN's pending eviction from the Palestine Hotel and by the critical importance to MBN of uninterrupted news operations in Baghdad.

13.     On or about September 23, 2013, MBN signed a purchase order ("PO") with MBI, pursuant to which the latter agreed to build the BRB and to deliver it at MBN's branch office in Baghdad and complete its installation no later than December 31, 2013. The total amount of the PO was $534,311.00, which amount included $37,000 for the installation (to be performed by a third party) and the parties' estimate of "other services" to be paid to third parties (including customs fees and VAT). The BRB itself was priced at $473,611. The PO was accompanied by a long-form term sheet that was drafted by MBI ("Sales Agreement").

14.     Upon signature of the PO, MBN tendered $187,001 (approximately 35 percent of the total price) to MBI (the "Down Payment").

15.     The Sales Agreement did not include a payment schedule or a breakdown of costs and expenses (such as, for example, drawings, wiring or transportation). The Sales Agreement did not include a payment schedule or a breakdown of costs and expenses because it was not a contract for construction, but rather a memorialization of a consumer transaction, by which MBI promised to provide a deliverable (the BRB) to MBN in Baghdad, Iraq on or before December 31, 2013, and MBN agreed to pay a sum certain therefor.

16.     In October 2013, MBI provided schematic drawings of the BRB to MBN for its approval. A joint meeting of principals was held at MBN's Springfield headquarters on October 22, 2013.

17.     In November 2013, communications from MBI to MBN slowed to a trickle. Because it had already timely approved all of the drawings provided to it by MBI, however, MBN had no reason to believe anything was amiss.

18. On or about November 27, 2013 (that is, approximately five weeks prior to the promised delivery date), MBN received an email from MBI's Vice President, Gary Bowen, in which the latter stated that there had been a change in the AC units but that MBI would "notify MBN by 29 Nov if change in HVAC creates a change in delivery dates."

19. No notification followed.

20. On or about December 6, 2013, MBN received an email from MBI and a final set of drawings. In the email, MBI wrote that MBN's approval of the drawings was required by "13 December" in order to "keep delivery schedule."

21. MBN provided its final approval four days ahead of the deadline, on December 9, 2013.

22. Over the course of the next 10 days, MBN received no further communication from MBI.

23. On or about December 19, 2013, after two telephone calls to MBI went unanswered, MBN made a written request to MBI for an update on the project and the "approximate date of delivery to Baghdad."

24. In response, on December 20, 2013, MBI informed MBN for the first time that the project was "4 to 5 weeks behind schedule." MBI's Vice President Gary Bowen wrote:

> As an update for you, we are about 4 to 5 weeks behind schedule. There has been a problem in getting the steel and HVAC units which we thought were readily available and our engineering department fell short by 2½ weeks on delivery of the drawing package. Another delay in the project is related to an acquisition and new money and that [sic] the company is going through. It is a very positive transformation for the company.

25. As the email of December 20, 2013 made clear, MBI had known that the project was behind schedule for at least several weeks (if not longer) and nevertheless continued through

5

November and December to provide false written assurances to MBN that no delays were anticipated.

26. The statement in the email of December 20, 2013 that the project was "4 to 5 weeks behind schedule" was also erroneous, as a subsequent January 2, 2014 email made clear. Then, MBI wrote that "4 to 5 weeks" behind schedule "puts us" at "the end of February/1st to 2nd week of March" – a delivery schedule that meant the project was not 4-5 weeks behind schedule but, instead, 8-11 weeks behind schedule.

27. After telephone calls yielded no positive results or assurances, MBN sent to MBI a detailed list of demands on January 7, 2014, in which it noted, *inter alia*, that "MBN entered into a contract with MBI for the purchase and installation (in Baghdad) of a Blast Resistant Building because MBN needed to move its 24/7 Iraq news operations to a new location," that "MBI has been aware of MBN's operational needs and the urgency of its requirements since (September 2013)" and that "MBN had relied on MBI's expertise and MBI's express promises to its detriment."

28. In numerous calls in early January, MBI was further made aware of the significant operational difficulties MBN was encountering as a result of the delay, as well as of the significant financial costs to be incurred by MBN for "temporary" space required as a result of the delay.

29. MBI knew that MBN had bargained for a 12/31 delivery and installation date because its lease at the Palestine Hotel would end in January.

30. In January, MBI offered MBN a $100,000 credit and agreed to an amended agreement with MBN ("Amendment"), pursuant to which MBI promised to have the BRB

delivered by April 16, 2014 and installed and ready for occupancy ("Commissioned") no later than April 23, 2014.

31. The $100,000 credit reflected the Parties' estimate of the combined costs of moving MBN's television studio sets plus three months of rental expenses at a temporary location – all made necessary by MBI's initial material breach of the Sales Agreement.

32. MBI also agreed to provide written status reports to MBN on a weekly basis.

33. On or about February 5, 2014, MBI (through its President, Phil Moore) reported that the status of the BRB was "no deviations" from the timeline appended to (and incorporated within) the Amendment. Subsequently, written updates ceased.

34. On or about February 22, 2014, after numerous requests for information from MBN, Mr. Moore wrote: "I have been involved in a corporate merger of MBI with another company and have been distracted [sic] I am currently in the middle east and will be headed to Turkey at the end of the week to review the progress personally. My site inspector is in place in Ankara and I will get the direct status update from him and forward it to you."

35. On or about February 25, 2014, Mr. Moore forwarded a certificate relating to the structure of the BRB to MBN.

36. When it failed to receive any further status updates, MBN again tried to reach MBI during the last week of February and the first week of March.

37. On or about March 6, 2014, Mr. Moore sent "the as built drawings" and noted that "(w)e are still making progress."

38. On or about March 7, 2014, MBN again requested a detailed report on the status of the project, and asked that MBI send a "work breakdown structure and a timeline."

39. On or about March 12, 2014 -- *sixteen days* after the last substantive update from MBI -- MBN demanded a written progress report.

40. In response, on or about March 14, 2014, Mr. Moore provided a great deal of information about the pending merger between MBI and another building company (none of which was of any interest or concern to MBN) – but only a promise to provide an actual update on the status of the project at some unspecified point in the future.

41. On or about March 25, 2014, Mr. Moore wrote that the BRB was "fifty percent complete."

42. Upon information and belief, the BRB was not "fifty percent complete" at the time that statement was made to MBN.

43. On or about March 25, 2014, Mr. Moore also informed MBN for the first time that the Project Manager for the BRB had "quit unexpectedly." In a follow up email sent March 29, 2014, he added that "we still do not see a significant issue with delivery."

44. On or about April 5, 2014, MBN received a lengthy (and unsolicited) email from a purported investor in MBI.

45. On April 8, 2014 – just eight days before the revised promised delivery date of the BRB in Baghdad – MBN sent to MBI a Demand for Adequate Assurance of Performance. MBN demanded a response no later than April 9, 2014, time being "of the essence."

46. On or about April 10, 2014, Mr. Moore acknowledged receipt of the demand (the "April 10 Letter") and assured MBN "that at no time has anyone from the MBI Global team intentionally tried to deceive anyone at MBN."

47. In the April 10 Letter, Mr. Moore also wrote:

   (a) An entire paragraph about the corporate merger.

    (b)    That there were three "projects ongoing in the same location in Turkey" and because of the "funding crisis" caused by the slowness of completion of the merger, the other projects were delayed and these delays "blocked production of the MBN unit since the floor space in the plant was occupied by the stalled projects."

    (c)    That he was dispatching "the MBI Global Mid East Director" to Turkey and that this Director would provide to Mr. Moore "the updated status of the project not later than Thursday night local time ... for us to update to you."

    (d)    That he would "forward the revised schedule and impacts to you as soon as they are assessed . . . and we have them formatted with a positive plan of action."

48.    At no time prior to the April 10 Letter had anyone from MBI informed MBN that the construction of the BRB was being held up by a funding issue pertaining to two other projects. Indeed, at no time prior to the April 10 Letter had anyone from MBI suggested that MBN's BRB project was behind schedule or that it would not be completed and installed in mid-April.

49.    In a follow-up letter dated April 15, 2014 (the "April 15 Letter"), Mr. Moore sent photos of the BRB project under construction and also commented on the HVAC systems: "We directed our subcontractor to acquire the HVAC systems over 5 weeks ago. On (the project manager's) arrival he was told they had not order [*sic*] the HVAC system. The HVAC supplier informed us that unit had a 6 week lead time which is unacceptable. I have directed our subcontractor monitored by (the project manager) to immediately source a suitable substitute HVAC system that meets the required specifications . . . . The initial search indicates that a suitable, equally reliable unit is available in stock or in short notice supply in Turkey."

50.    Upon information and belief, there was no "suitable, equally reliable unit" in stock or in short notice supply in Turkey.

9

51. Appended to the April 15 Letter was a revised schedule showing transportation to Baghdad and installation of the BRB in Baghdad on or before June 3, 2014.

52. On or about April 16, 2014, MBN sent to MBI a Formal Notice of Breach, in which it noted that "[a]s is clear from the (April 15 Letter), the BRB will neither be completed nor delivered in accordance with the (Amendment) or the Delivery Schedule" and that the "(April 15 Letter) indicates a new turnover date" more than six weeks past the revised date in the Amendment.

53. On or about May 2, 2014, MBN sent a draft of points for a 2nd Amendment to the Sales Agreement to MBI; MBI ignored it.

54. On or about May 6, 2014, Mr. Moore sent a status report in which he noted that among the items "required for completion" was "HVAC installation." Mr. Moore also confirmed a Commissioning date of June 1 in Baghdad.

55. On or about May 16, 2014, Mr. Moore sent a status report in which he noted that "HVAC installation" would be "completed over the next week" and confirmed that there was no change in delivery schedule.

56. On or about May 23, 2014, Mr. Moore sent a status report in which he noted that the HVAC that MBI had previously said was ordered and procured on April 15, and that MBI had previously said was to be installed the week of May 6 (and then said was to be installed the week of May 16) had not, in fact, even been delivered.

57. MBN subsequently demanded confirmation of the promised Commissioning date for the BRB.

58. On or about May 28, 2014, Mr. Moore sent a status report in which he stated that the HVAC still "ha(d) not arrived." Mr. Moore also promised that when the HVAC arrived, MBI would ship the BRB "the next day."

59. On or about May 30, 2014, Mr. Moore sent an email in which he claimed to be "working the phones to get HVAC issue resolved."

60. On or about June 2, 2014, MBN noted in an email to MBI that it had been waiting for five days for information.

61. On or about June 3, 2014, counsel for MBI notified MBN that the HVAC system had "arrived" but "is not wired." Counsel stated that the new delivery/commissioning date would be June 26, 2014.

62. On June 6, 2014, June 9, 2014 and June 10, 2014 MBN sent emails to MBI requesting status updates. MBN received no response to any of these emails.

63. On or about June 12, 2014, MBN wrote to MBI's counsel, stating that MBN had "received no information about the status of the building, the installation of the HVAC or the commissioning. We have received no photos. We have no information about the transport."

64. On or about June 13, 2014, MBI notified MBN that MBI wanted to deliver the BRB to "another location" (other than Baghdad) and stated that MBI had not arranged for delivery and had no shipper or delivery plan.

65. MBI knew MBN had no offices in Iraq outside of Baghdad and had no need for a BRB in any location other than Baghdad, where it was desperately needed and to which MBI had repeatedly promised delivery.

66. On or about June 16, 2014, counsel for MBI wrote to MBN, stating:

> As noted (in a voicemail), I have confirmation the bldg. and HVAC are ready . . . only as you can imagine the transportation is a complete mess.

> Phil Moore is on the ground and trying to find a route into Baghdad. As we discussed last week, the Northern route is clearly a no go. The direct south route goes through ISIS controlled regions and anything that is related to the US Gov't (i.e. Al Hurra) is going to run into trouble. Likewise, the route via Jordan through Anbar Province is equally unreliable.
>
> That leaves two remaining options: 1) move the unit by water to Saudi Arabia and by truck via a southern route; or 2) move the unit via the ports in Kuwait and Iraq in the Arabian Gulf.

67. On or about June 17, 2014, MBN sent a Formal Notice of Cancellation to MBI, in which it noted that:

> As of this morning, delivery/commissioning of the Blast Resistant Building is six-and-a-half months behind schedule. MBI has already missed four promised delivery and commissioning dates. Indeed, since signing the original contract in September, MBI has missed all major deadlines, broken repeated promises to provide timely information and updates, ignored requests from MBN for information (sometimes for weeks at a time) and provided incomplete and/or misleading information.
>
> While MBI has now notified MBN that the Blast Resistant Building is "complete," MBI has no delivery date for the Building, no delivery route on which to take it, and no current means or provider of delivery; at the same time, MBI has neglected to provide MBN with the certified report from an independent engineer that it promised to send.
>
> MBN's need for a secure studio for its Baghdad staff, always important, has never been more critical. MBI's serial failures to deliver the Building have jeopardized MBN's operations and MBN is not willing to entertain a fifth revision to the delivery schedule.

68. MBN then cancelled the contract and made a formal demand for a refund of the Down Payment ($187,001.00) tendered to MBI, in good faith, in September 2013.

69. On or about June 20, 2014, MBI notified MBN that it remained "prepared to transport the building" per MBN's instructions -- to a location other than Baghdad. MBI also notified MBN that the building "cannot continue to sit on the factory floor" and threatened that if MBN did not provide instructions for delivery of the BRB, MBI would "store the building and

transmit the storage bills to" MBN for payment. MBI wrote: "Please also take into account, if (MBN) later decides a location where it wants the building there will be associated expenses incurred by (MBI) to remobilize and prepare the building for shipping."

70. On or about June 23, 2014, MBI notified MBN that it had not arranged transport of the BRB and asked whether MBN's news staff in Baghdad knew of "a transport company . . . willing to transport the building into Baghdad."

71. On or about June 25, 2014, MBI notified MBN that a promised inspection of the BRB had been "performed yesterday." MBI notified MBN that the "final report" would be delivered to MBN "shortly."

72. · On or about June 25, 2014, MBI notified MBN that "[w]hile the building is ready to go, there does not appear a viable route to Baghdad."

73. Upon information and belief, at the time of the June 25, 2014 notification, there were at least two "viable" routes to Baghdad, each involving transportation of the BRB by barge either to Kuwait ("Kuwait Route") or Basra, Iraq ("Basra Route") and then overland to Baghdad.

74. On or about July 2, 2014, MBI provided a barebones inspection report to MBN.

75. On or about July 2, 2014, MBI provided a proposed delivery plan to MBN.

76. On or about July 2, 2014, MBI sent an email saying that a "safe transport route has developed" and demanding that MBN execute a "change order" for an "increase in the transport fee."

77. On July 3, 2014, MBN wrote to MBI (the "July 3 Letter"), stating that:

 (a) MBN would accept delivery of the BRB in Baghdad, Iraq provided that said delivery is completed in thirty (30) days or less. Thus, the BRB must be in Baghdad and ready for installation on or before August 3, 2014. This deadline is *not flexible* and *will not be waived or excused for any reason whatsoever.* (Emphasis in the original.)

(b) MBN would not pay any additional "transportation" costs. There was never any agreement between the parties that transportation was a separate budget item and, in any event, to the extent extra costs will be incurred by MBI, such costs are a direct and proximate result of MBI's inability to fulfill its obligations in a timely manner. MBN already has incurred tens of thousands of dollars in expenses as a direct and proximate result of MBI's serial breaches of contract.

(c) MBN would tender *no additional funds* to MBI until MBI had delivered the BRB in Baghdad on or before August 3, 2014.

78. In response, on or about July 8, 2014, MBI accepted the terms and conditions outlined in the July 3 Letter by requesting that MBN provide to it the "exact delivery address" for delivery of the BRB in Baghdad.

79. That same day, MBN provided the exact delivery address for delivery of the BRB in Baghdad.

80. On July 10, 2014, MBN requested (in writing) that MBI "confirm that shipment is underway" and "provide a current estimated delivery date." MBN asked that this information be provided no later than COB on July 11, 2014.

81. MBI did not respond to MBN's July 10, 2014 request.

82. On July 13, 2014, MBN again requested (in writing) that MBI that MBI "confirm that shipment is underway" and "provide a current estimated delivery date."

83. MBI did not respond to MBN's July 13, 2014 request.

84. On July 14, 2014, MBI's counsel sent an email to MBN stating that he would "be in touch tomorrow AM."

85. At 5:10 pm on July 15, 2014, having not heard from MBI or its counsel, MBN again wrote to them, asking, "What is the status?"

86. On July 16, 2014, MBI wrote to MBN stating that "the transportation route to Baghdad is once again closed."

87. Attached to the July 16, 2014 correspondence was a letter, purportedly from a shipper, describing alleged problems with a checkpoint in Kurdistan (in Northern Iraq). The letter was dated July 11, 2014 (the "July 11 Letter").

88. In the July 11 Letter, the shipper wrote that an organization called "MoveOne" stated "that the ISIS militia group violently attacked the check point allowing access from Kurdistan into central and southern Iraq. The information we received indicated that the attack was very violent. This action by ISIS has caused the Iraqi authorities to close the check points and prohibit any commercial road traffic to pass until further notice."

89. The shipper did not indicate when the alleged attack on the checkpoint occurred or when the Iraqi authorities closed the checkpoints.

90. The "transportation route to Baghdad" to which MBI referred was the transportation route through Northern Iraq that MBI had told MBN on June 16, 2014 was a "no go."

91. Upon information and belief, MBI never took any steps to explore any alternative transportation route, including transportation via the Kuwait Route or the Basra Route.

92. Upon information and belief, MBI knew on or before July 11, 2014 that it neither had taken any steps to explore alternative transportation routes to, nor would take any steps to explore any alternative to, the transportation route through Northern Iraq that it had stated on June 16, 2014 was a "no go" and, further, knew on or before July 11, 2014 that the route through Northern Iraq would not work.

93. In correspondence from MBI's attorney dated July 16, 2014, MBI stated that it was "making arrangements to move the BRB to a storage location in Turkey."

94. Upon information and belief, MBI had intended to move the BRB to a storage location in Turkey (rather than deliver it to Baghdad) since mid-June, 2014 and made no real effort to secure transportation of the BRB to Baghdad.

95. In correspondence from MBI's attorney dated July 16, 2014 (the "July 16, 2014 Letter"), MBI demanded that MBN immediately tender "$134,076.90" to it for "the work performed by MBI Global to finish the fabrication of the BRB and the corresponding interior finishes work." At the time this correspondence was delivered, MBI knew (and had known since July 3, 2014) that MBN would not provide any additional funds to MBI unless and until the BRB was delivered to Baghdad on or before August 3, 2014.

96. In the July 16, 2014 correspondence, MBI also wrote that "(t)he remaining amount due under the Contract, $89,633 related to scope of work items that are on hold as a result of the force majeure. Specifically, $37,000 for BRB site installation, $30,000 for delivery of the BRB, and $22,533 for the O&M Warranty and Final Acceptance."

97. Neither the Sales Agreement, drafted by MBI, nor any of the subsequent Amendments or agreements contained any breakdown of costs and expenses, but only a lump sum for the deliverable MBN ordered: a BRB in Baghdad, Iraq. Prior to the July 16 Letter, MBI had never provided any information to MBN regarding any amounts "due under the Contract."

98. In the July 16, 2014 correspondence, MBI also said that it was "formally asserting the Force Majeure clause of its Contract with MBN." The basis for the "assertion" of this clause was MBI's assertion that "there is no viable transportation route into Baghdad, let alone a safe route, available to MBI Global."

99. Upon information and belief, MBI took no steps to explore any transportation route other than the route through Northern Iraq which it knew and stated in mid-June was a "no go."

100. Upon information and belief, MBI declined to arrange transportation of the BRB via the Kuwait Route or via the Basra Route, both of which were and are "viable alternatives."

101. Upon information and belief, MBI did not want to incur the expense of transporting the BRB via the Kuwait Route or via the Basra Route.

102. The possibility that additional expense will be incurred is not a recognized basis for the invocation of force majeure.

103. Force majeure clauses are always interpreted narrowly.

104. The final offer made by MBN (and accepted by MBI by subsequent action) explicitly excluded the possibility of force majeure. Specifically, the July 3, 2014 Letter stated that the August 3, 2014 deadline "is *not flexible* and *will not be waived or excused for any reason whatsoever*."

## COUNT I
### (*Breach of Contract*)

105. Plaintiff re-alleges and incorporates the preceding paragraphs as if fully set forth herein.

106. Plaintiff and Defendant entered into a valid contract (the Sales Agreement) and, subsequently, valid amendments thereto.

107. Pursuant to the Sales Agreement and amendments thereto, Defendant promised and agreed to deliver the completed BRB to Baghdad, Iraq by dates certain.

108. The date and place of delivery set forth in the Sales Agreement and amendments thereto were material terms of that Sales Agreement and those amendments.

109. All of the required delivery dates have passed and Defendant has not delivered the BRB to Baghdad.

110. Defendant has materially breached the Sales Agreement and all the amendments thereto and Plaintiff has suffered damages as a direct and proximate result thereof.

111. Plaintiff is therefore entitled to damages resulting from Defendant's material breaches as aforesaid.

WHEREFORE, Plaintiff respectfully demands judgment against Defendant as follows: (1) Refund of Plaintiff's down payment in the amount of $187,001.00; (2) compensatory damages in the amount of $250,000.00, which shall be proven at trial; (3) pre- and post-judgment interest at the applicable rates; (4) fees and costs; and (5) such other and further relief as this Court deems proper.

## COUNT II
### (*Unjust Enrichment*)

112. Plaintiff re-alleges and incorporates the preceding paragraphs as if fully set forth herein.

113. In providing Defendant with a Down Payment of $187,001.00, Plaintiff conferred a benefit on Defendant.

114. The Down Payment was made on a Sales Agreement requiring delivery of the BRB to Plaintiff's office in Baghdad by a date certain.

115. Defendant knew of and appreciated the conferral of the benefit and should reasonably have expected to perform its obligations under the Sales Agreement.

116. Defendant did not deliver the BRB to Baghdad.

117. Defendant has failed and refused to deliver the BRB to Baghdad.

118. Defendant accepted and retained the Down Payment without performing its obligations under the Sales Agreement.

119. Continued retention of the Down Payment by Defendant would be inequitable and constitutes unjust enrichment of the Defendant.

WHEREFORE, Plaintiff respectfully demands judgment against Defendant as follows: (1) Refund of Plaintiff's down payment in the amount of $187,001.00; (2) compensatory damages in the amount of $250,000.00, which shall be proven at trial; (3) pre- and post-judgment interest at the applicable rates; (4) fees and costs; and (5) such other and further relief as this Court deems proper.

### Jury Demand

Plaintiff hereby requests trial by jury.

Respectfully submitted,

Middle East Broadcasting Networks, Inc.

By: *[signature]*

Peter C. Grenier (Va. Bar No. 50997)
Andre M. Gregorian (Va. Bar No. 78530)
GRENIER LAW GROUP PLLC
1400 L Street, N.W.
Suite 420
Washington, D.C. 20005-3509
Tel.:  202-768-9600
Fax:  202-768-9604
Email: pgrenier@grenierlawgroup.com
Email: agregorian@grenierlawgroup.com

*Counsel for Plaintiff*